<div align="center">

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

</div>

JULIA LEIB and LISA THOMPSON,
Individually, and on behalf of all persons
similarly situated,

    Plaintiffs,

  v.              No. 06-cv-802-JPG-CJP

REX ENERGY OPERATING CORP., a
Delaware corporation, and PENNTEX
RESOURCES ILLINOIS, INC., a Delaware
corporation,

    Defendants.

<div align="center">

## MEMORANDUM AND ORDER

</div>

   This matter comes before the Court on the plaintiffs' amended motion for class

certification (Doc. 62) and memorandum in support (Doc. 63).  The defendants submitted a

response (Doc. 65) to which the plaintiffs replied (Doc. 68).

   This case is a putative class action brought by two named plaintiffs on behalf of "all

persons and non-governmental entities that own property or reside on property located in the

towns of Bridgeport, Illinois and Petrolia, Illinois."[1]  The plaintiffs allege that their properties

were contaminated with unsafe levels of hydrogen sulfide ($H_2S$), a poisonous gas, released from

the more than 100 nearby oil wells owned by defendant PennTex Resources Illinois, Inc.

("PennTex") and managed by defendant Rex Energy Operating Corporation ("Rex Energy").  In

the Second Amended Class Action Complaint, the plaintiffs allege the defendants' conduct is

---

[1]In their motion for class certification, the plaintiffs propose a class consisting of "all
persons and non-governmental entities that own property or reside on property located in the
Class Area, which consists of a substantial majority of the towns of Bridgeport, Illinois and
Petrolia, Illinois."  The proposed Class Area is indicated on a map attached to the motion.

actionable under the Illinois Environmental Protection Act, 415 ILCS 5/1 *et seq.* (Count I), under theories of negligence (Count II), private nuisance (Count III), trespass (Count IV), and willful and wanton misconduct (Count V), and under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.* (Count VI). The plaintiffs seek injunctive relief restraining the defendants from allowing further contamination and forcing them to abate the existing contamination, compensatory damages for injury to property, the establishment of a Court-administered fund for medical monitoring of class members, punitive damages, costs and fees.

## I.    Background

Defendant PennTex owns more than 100 oil wells in the Lawrence Wellfield near the communities of Bridgeport and Petrolia, Illinois. Defendant Rex Energy manages the operation of those wells. The plaintiffs allege that during the operation of the defendants' oil wells, elevated levels of $H_2S$, a poisonous gas, were released into the air in and around Bridgeport and Petrolia, Illinois (the proposed "Class Area"). Exposure to $H_2S$ at low levels can cause permanent neurological damage as well as cardiac, respiratory and other related health problems and at high levels can cause death. According to the plaintiffs, PennTex and Rex Energy had assured those who lived in the area of the oil wells that the levels of $H_2S$ released did not pose a health or safety threat, but the United States Environmental Protection Agency ("USEPA") and the Agency for Toxic Substances and Disease Registry later confirmed that the levels of $H_2S$ released were elevated and dangerous to health. The plaintiffs claim PennTex and Rex Energy did not promptly respond to known releases of elevated levels of $H_2S$ or otherwise warn the public about or protect the public from those emissions. They also claim the defendants' release of elevated levels of $H_2S$ threatens the health and safety of the people living near the oil wells,

has damaged their personal property and has diminished the value of their real properties.

Julia Leib and Lisa Thompson, both of whom live in Bridgeport, Illinois, filed this lawsuit in October 2006 and amended their complaint in November 2006 and March 2007. On October 25, 2006, the plaintiffs sent a letter to the defendants giving them notice of the alleged RCRA violation and sent copies to the USEPA, the United States Attorney General, the Regional Administrator for Region V of the USEPA and the Illinois Environmental Protection Agency ("IEPA"). The plaintiffs claim that this lawsuit seeks only injunctive relief and compensation for damage to property, not compensation for personal injuries, although they seek the creation of a fund for medical monitoring and treatment of class members.

In June 2007, the defendants, the USEPA and the IEPA agreed to a consent decree in a related case requiring the defendants to take actions to control $H_2S$ emissions from and take remedial measures within the Lawrence Wellfield, an area larger than, but encompassing, the Class Area. Nevertheless, the plaintiffs claim $H_2S$ is still found in elevated concentrations on occasion in the Class Area.

## II.    Class Certification

The plaintiffs argue that environmental contamination claims such as theirs are consistently certified for class treatment and assert that *Mejdrech v. Met-Coil Systems Corporation*, 319 F.3d 910 (7th Cir. 2003), *aff'g* No. 01 C 6107, 2002 WL 1838141 (N.D. Ill. Aug. 12, 2002)[2], controls this case. The defendants argue that *Mejdrech* is distinguishable and

---

[2]The Court notes that the district court and appellate opinions spell the last name of two plaintiffs differently. The district court uses "Mejdreck"; the appellate court uses "Mejdrech." A review of the filings by the plaintiffs themselves reveals that the correct spelling is "Mejdrech," the spelling used by the appellate court. For consistency's sake, the Court will refer to both opinions using the parties' correct name, Mejdrech.

that class certification is inappropriate under Federal Rule of Civil Procedure 23.

Because *Mejdrech* is central to both parties' arguments, the Court will review it briefly, giving fuller treatment to individual aspects of the case where necessary in subsequent discussions. *Mejdrech* was a groundwater pollution case brought by plaintiff Thomas Mejdrech against defendant Met-Coil Systems Corp. Mejdrech sought class certification for the approximately 1,000 individuals owning property within a mile or two of a Met-Coil factory that allegedly leaked a noxious solvent, TCE, into the soil and groundwater beneath the soil, impairing the value of the putative class members' properties. *Mejdrech*, 319 F.3d at 911. The District Court certified a class to determine "'the core questions, i.e., whether or not and to what extent [Met-Coil] caused contamination of the area in question,'" but left the question of the amount of damage, if any, for individual follow-up hearings. *Id.* (quoting *Mejdrech*, 2002 WL 1838141 at *7). The Court of Appeals affirmed the class certification decision, finding that the judicial economy from consolidating the separate claims outweighed concerns of inaccuracy from deciding the common issues in one fell swoop. *Mejdrech*, 319 F.3d at 911-12. The need for individualized damages determination did not preclude class certification on the common issues. *Id.* at 911-12.

With *Mejdrech* in mind, the Court turns to the technical requirements for certification of a class action.

A.    Certification Requirements

Rule 23 of the Federal Rules of Civil Procedure, which governs class certification determinations, allows a plaintiff to sue on behalf of a class only if:

(1)    the class is so numerous that joinder of all members is impracticable;

> (2)     there are questions of law or fact common to the class;
>
> (3)     the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4)     the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *see Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997). "All of these elements are prerequisites to certification; failure to meet any one of them precludes certification as a class." *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596 (7th Cir. 1993) (citing *Harriston v. Chicago Tribune Co.*, 992 F.2d 697, 703 (7th Cir. 1993)). It is the moving party's burden to establish that each of the prerequisites of Rule 23 are satisfied. *General Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 161 (1982); *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006), *cert. denied*, 127 S. Ct. 2952 (2007).

If all of the elements of Rule 23(a) are met, the moving party must also show one of the elements outlined in Federal Rule of Civil Procedure 23(b). *Amchem*, 521 U.S. at 614; *Oshana*, 472 F.3d at 513. The plaintiffs seek class certification under all three subsections of Rule 23(b), that is, where

> (1) prosecuting separate actions by or against individual class members would create a risk of:
> > (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
> > (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
>
> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Fed. R. Civ. P. 23(b).

The moving party must also show that the class is identifiable as a class. *Oshana*, 472 F.3d at 513; *Simer v. Rios*, 661 F.2d 655, 669 (7th Cir. 1981) ("It is axiomatic that for a class action to be certified a 'class' must exist.").

Generally, when ruling on a motion for class certification, the Court does not consider the merits of the case; rather, the Court focuses on whether the certification requirements are satisfied. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974). "'[T]he question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.'" *Id.* (quoting *Miller v. Mackey Int'l, Inc.*, 452 F.2d 424 (5th Cir. 1971)). Thus, the Court's role in the action currently under review is to "determine whether the plaintiff[s are] asserting a claim which, assuming its merits, would satisfy the requirements of Rule 23." *See* H. Newberg, 8 *Newberg on Class Actions*, § 24.13 (3d ed. 1992). The Court has broad discretion to decide whether to grant class certification. *Keele v. Wexler,* 149 F.3d 589, 592 (7th Cir. 1998).

Nonetheless, the determination of a class certification motion may involve some consideration of the factual and legal issues that comprise the plaintiff's cause of action. *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978). While the Court may not consider arguments directly on the merits, it may make a preliminary inquiry into the merits of the action when necessary to determine whether the requirements for class certification have been met. *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676-77 (7th Cir. 2001). For example, it may

6

take into account the substantive elements of a plaintiff's claims and the proof necessary to those elements so as to envision the form trial on those issues would take. *Elliott v. ITT Corp.,* 150 F.R.D. 569, 573 (N.D. Ill. 1992) (citing *Simer v. Rios*, 661 F.2d 655, 672 (7th Cir. 1981)). Throughout this analysis, the Court bears in mind that a principal purpose of class certification is to save the resources of both the courts and the parties by permitting an issue potentially affecting every class member to be litigated in an economical manner. *See General Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 155 (1982).

The Court must rigorously assess whether the prerequisites have been met, *see Falcon*, 457 U.S. at 161, and, if the party seeking class certification meets each of them, the Court must certify the proposed class, *see Vickers v. Trainor*, 546 F.2d 739, 747 (7th Cir. 1976); *Fujishima v. Board of Educ.*, 460 F.2d 1355, 1360 (7th Cir. 1972). The Court has broad discretion to determine whether a proposed class satisfies the requirements, *Keele v. Wexler,* 149 F.3d 589, 592 (7th Cir. 1998); *Patterson v. General Motors Corp.*, 631 F.2d 476, 480 (7th Cir. 1980), and should err in favor of maintaining class actions, *King v. Kansas City S. Indus., Inc.*, 519 F.2d 20, 26 (7th Cir. 1975). The Court may alter or amend the definition of a proposed class before a final decision on the merits. *See* Fed. R. Civ. P. 23(c)(1)(C); *Metropolitan Area Hous. Alliance v. United States Dep't of Hous. & Urban Dev.*, 69 F.R.D. 633, 637 n.7 (N.D. Ill. 1976); Wright, et al., *Federal Practice & Procedure*, § 1760 (2d ed. 1986).

B.     Implied Prerequisites to Class Certification

Before the Court can address the issues raised by Rule 23(a), two implied prerequisites to class certification exist. First, the class must be sufficiently defined so that the class is identifiable. *Alliance to End Repression v. Rochford*, 565 F.2d 975, 977 (7th Cir. 1977); *Duffin*

*v. Excelon*, No. CIV A 06 C 1382, 2007 WL 845336 at *3 (N.D. Ill. Mar. 19, 2007). Second, the named representatives must fall within the proposed class. *Alliance to End Repression*, 565 F.2d at 977. The defendants contest only the first implied prerequisite: that the class is identifiable.

It is absolutely necessary that for a class action to be certified, the class must be susceptible to a precise definition. Therefore, the class description must be sufficiently definite so that it is administratively feasible for the Court to determine whether a particular individual is a member of the proposed class. Furthermore, for a class to be sufficiently defined, the identity of the class members must be ascertainable by reference to objective criteria. *Gomez v. Illinois State Bd. of Educ.*, 117 F.R.D. 394, 397 (N.D. Ill. 1987). The definition of a class should not be so broad so as to include individuals who are without standing to maintain the action on their own behalf. The Seventh Circuit Court of Appeals has stated repeatedly that whether the description of a class is sufficiently definite to permit ascertainment of the class members must be determined on a case-by-case basis. *Alliance to End Repression*, 565 F.2d at 977.

In their motion for class certification, the plaintiffs propose certification of the following class:

> all persons and non-governmental entities that own property or reside on property located in the Class Area, which consists of a substantial majority of the towns of Bridgeport, Illinois and Petrolia, Illinois.

Pls' Mem. Supp. Class Cert. (Doc. 63) at 3. A map attached to the motion with handwritten boundary markings defines the proposed Class Area. The plaintiffs derived this area after their expert, Jim Tarr, conducted an air dispersion modeling study on some of the $H_2S$ emitting sources belonging to the defendants.

Rex and PennTex complain that the plaintiffs' proposed verbal class definition is too

vague because it refers only to a "substantial majority" of Bridgeport and Petrolia and that the proposed Class Area boundaries drawn on the map are arbitrarily drawn, are unrelated to objective evidence of actual $H_2S$ emissions from the defendants' oil wells and are based solely on data from 2002, before the defendants implemented certain control measures. The defendants rely on *Duffin v. Excelon* in support of their argument. In *Duffin*, the plaintiffs sought class certification for property owners in an area surrounding a nuclear power plant and pipeline from which tritium had allegedly leaked into the groundwater and subsequently evaporated into the air. *Duffin*, 2007 WL 845336 at *1. The plaintiffs defined the proposed class area as all present property owners within a defined geographic area. *Id.* at *2. The court found that the proposed class definition was overbroad because the class area was defined in geographic terms unrelated to evidence of the area of actual tritium groundwater contamination (the "plume") or airborne contamination. *Id.* at * 3-4. The evidence showed the groundwater plume covered only 2% of the proposed class area and the possible airborne contamination reached only 74% of the proposed class area. *Id.* The court concluded that the proposed class was overbroad and not sufficiently definite. *Id.* at *4.

The plaintiffs argue that this case is like *Mejdrech* in that the precise scope of the defendants' alleged contamination is one of the issues appropriate for class treatment and need not be proved with precision prior to class certification. *See Mejdrech*, 319 F.3d at 911. They further argue that, unlike the proposed class area in *Duffin*, their proposed class area is supported by their expert's findings and by the consent decree under which the defendants agreed to control $H_2S$ contamination throughout the entire Lawrence Wellfield, an area larger than but inclusive of the proposed Class Area.

After reviewing Tarr's report, the Court is satisfied that there is an adequate relationship between the evidence of contamination and the proposed Class Area. Tarr's report describes an air dispersion modeling study of the $H_2S$ emissions from 206 of the defendants' oil wells and 12 of the defendants' storage facilities ("tank batteries") for the sample year 2002, a sample size Tarr considers adequate for a reliable conclusion. The report does not include more than 800 other wells and numerous other $H_2S$ emission sources in the area owned or operated by the defendants. As a result, Tarr states that his results are conservative. Tarr's results showed elevated levels of $H_2S$ in the entire proposed Class Area. Unlike the class area in *Duffin*, here there is evidence linking the entire proposed Class Area to actual pollution from the defendants' facilities. That Tarr's opinion might be subject to challenge based on his underlying data, assumptions or methodology is a matter to be raised at the merits phase of this litigation. Furthermore, as noted in *Mejdrech*, flaws in Tarr's modeling may also be detected if and when this case proceeds to the damages phase. *See Mejdrech*, 319 F.3d at 912 ("The need for [proof of individual injuries] will act as a backstop to the class-wide determinations."). Any flaws that may exist in Tarr's report will not prevent certification of a class based on the indefiniteness of the class description.

The Court is uncomfortable, however, with the vagueness of the narrative description of the Class Area and the imprecision of the hand-drawn map of the Class Area. The phrase, "the substantial majority of the towns of Bridgeport, Illinois and Petrolia, Illinois," is too imprecise to determine who falls within that definition. It also contains no temporal component such as "current owners or residents" or "owners or residents within the years _____." The map helps to qualify the narrative definition, but is not specific enough. The lines delineating the Class

Area boundaries appear to be as wide, if not wider, than many of the streets or roads depicted on the map, that is, at least 40 feet wide (a typical width of a street or rural road). People owning land underneath the drawn lines could not tell whether they would be within the class or not. For this reason, if the Court finds that all other class certification requirements are met, the Court will require the plaintiffs to more precisely define the temporal and geographic limits of the class and the Class Area. They may do so either by specifying the streets or roads that serve as the boundaries of the Class Area, providing a "metes and bounds" description of the Class Area like the descriptions found in deeds, using a combination of those two methods or devising some other method to describe precisely where the Class Area boundary falls. If modified, the Court expects the proposed Class Area will be ascertainable and of the appropriate breadth.

The Court now turns to the explicit requirements of Rule 23.

C.     Rule 23(a) Requirements

Under Rule 23(a), a plaintiff seeking class certification bears the burden of showing that the four prerequisites have been met. *See General Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 161 (1982); *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596 (7th Cir. 1993). "All of these elements are prerequisites to certification; failure to meet any one of them precludes certification as a class." *Retired Chicago Police Ass'n*, 7 F.3d at 596.

1.     Numerosity of Parties

Rule 23(a)(1) requires that the proposed class be so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). When the class is large, numbers alone may be dispositive of numerosity. *See Riordan v. Smith Barney*, 113 F.R.D. 60, 62 (N.D. Ill. 1986). The defendants do not challenge the numerosity of the proposed class, and rightly so. This action is

brought on behalf of over 1,000 homes, approximately 2,500 people, within the Class Area. Such numbers meet the numerosity requirement. *See Mejdrech*, 2002 WL 1838141 at * 3 (approximately 1,000 homes housing over 2,000 people satisfy numerosity requirement).

        2.    Commonality of Issues

A named class representative may sue on behalf of the class only if there are questions of law or fact common to the class. This commonality requirement serves the dual purposes of (1) fair and adequate representation of the interests of absent class members and (2) practical and efficient case management. 5 James Wm. Moore *et al.*, *Moore's Federal Practice* ¶ 23.23 (3d ed. 1999). "A common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2)." *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998) (quoting *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992)). Common nuclei of fact are typically manifest where the defendants have engaged in standardized conduct towards members of the proposed class. *Id.*; *see also Chandler v. Southwest Jeep-Eagle, Inc.*, 162 F.R.D. 302, 308 (N.D. Ill. 1995). Some factual variation in the details of individual claims does not defeat a finding of commonality. *Rosario*, 963 F.2d at 1017. Courts give Rule 23(a)(2) a "highly permissive reading," requiring plaintiffs to show only that there is more than one issue of law or fact in common. *See Markham v. White*, 171 F.R.D. 217, 222 (N.D. Ill. 1997); *Wagner v. NutraSweet Co.*, 170 F.R.D. 448, 451 (N.D. Ill. 1997). Though the commonality requirement is permissive, an issue of law or fact is not "common" unless its resolution "will advance the litigation." *See Sprague v. General Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998). In pollution cases, the questions of whether the defendant caused contamination and the extent of that contamination can satisfy the commonality requirement. *Mejdrech*, 319 F.3d at 911; *Mejdrech*, 2002 WL

1838141 at * 3.

The plaintiffs' claims arise out of the same core of operative facts, that is, the allegation that the defendants allowed dangerous levels of $H_2S$ to contaminate the air in the Class Area. Such alleged behavior constitutes standardized conduct toward all prospective class members. Resolution of this question – whether and, if so, to what extent the defendants caused contamination in the Class Area – will certainly advance the litigation. The defendants do not challenge the fact that common issues exist, and *Mejdrech*, both at the District Court and Court of Appeals level, confirms that such questions are sufficient to establish the commonality requirement. *Mejdrech*, 319 F.3d at 911; *Mejdrech*, 2002 WL 1838141 at * 3. The Court agrees that the highly permissive commonality requirement is met in this case regardless of the individual requirements that are necessary to prove other aspects of individual class members' claims.

### 3.       Typicality of Claims and Defenses

Whether the named plaintiffs' claims are typical of those of the class members they represent is closely related to the commonality inquiry, but problems with commonality often take on greater significance in the typicality requirement. *See Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992) ("The question of typicality in Rule 23(a)(3) is closely related to the . . . question of commonality."). Subsection (a)(3) directs the Court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large. *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983). A "plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal

theory." *Id.*

Despite the apparent similarity, the commonality and typicality requirements serve different functions. The commonality requirement questions the relationship of the claims among the class itself, while the typicality requirement focuses on the relation between the representatives and the class as a whole. The Court should concentrate on the defendants' alleged conduct and the plaintiffs' legal theory to satisfy Rule 23(a)(3). *Rosario*, 963 F.2d at 1018. The typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members. *De La Fuente*, 713 F.2d at 232. Thus, similar legal theories may control even in the face of different facts. *Id.* "Properly applied, these guidelines should uphold the rationale behind the typicality requirement, namely that 'a plaintiff with typical claims will pursue his or her own self-interest in the litigation and in so doing will advance the interests of the class members, which are aligned with . . . those of the representative.'" *Insolia v. Philip Morris Inc.*, 186 F.R.D. 535, 544 (W.D. Wis. 1998) (quoting 1 H. Newberg, *Newberg on Class Actions*, § 3.13 (3d ed. 1992)).

The plaintiffs argue that their claims are typical of the proposed class members' claims because each class member's claim advances the same legal theories to establish liability and the right to injunctive relief. The plaintiffs contend that these common questions regarding the defendants' conduct and the extent of contamination, if any, caused by that conduct overshadow differing levels of exposure and damages, if any.

Rex and PennTex argue that the plaintiffs' claims are not typical of the proposed class members' claims because of the likelihood that class members have been exposed in various degrees over long periods of time to multiple $H_2S$ sources, including some that are not affiliated

with their oil wells or tank batteries. As a consequence, causation by the defendants' facilities will be different for each individual proposed class member. They note that each class members' exposure to $H_2S$, as well as the effects of that exposure, will vary within the proposed class. The defendants further argue that the plaintiffs' properties, which are owner-occupied residences, are not typical of those owned by proposed class members, which vary greatly in size, type and use as well as whether they are occupied by owners, renters or not at all.

The plaintiffs' claims are typical of those belonging to the rest of the proposed class members. As the *Mejdrech* District Court noted, "[p]laintiffs need not allege the same exact injury or be free of factual distinctions so long as their claims are based on the same legal theory." *Mejdrech*, 2002 WL 1838141 at *4. Here, determining the existence and the extent of the defendants' alleged $H_2S$ contamination will give clear answers as to what properties were affected and will go a long way to proving which residents were exposed to that contamination. While the points raised by the defendants will surely make putative class members' individual damage claims more difficult to prove, perhaps subjecting them to dismissal on summary judgment for insufficient evidence of causation by the defendants, the nature of all proposed class members' property damage claims is the same, all their claims rely on the same legal theories, and all their claims will turn, at least in part, on core questions of law and fact regarding the defendants' conduct. Thus, the plaintiffs' claims are typical of those of the proposed class.

### 4. Adequacy of Representation

The named plaintiffs are adequate representatives of the proposed class. The adequacy of representation requirement tends to merge with the commonality and typicality criteria of Rule 23(a). *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997). There are three elements of

adequate representation:

> (1) the class representative cannot have antagonistic or conflicting claims with other members of the class; (2) the class representative must have a "sufficient interest in the outcome to ensure vigorous advocacy;" and (3) counsel for the class representative must be competent, experienced, qualified and generally able to vigorously conduct the proposed litigation.

*Mejdrech*, 2002 WL 1838141 at *5 (citing *Chandler v. Southwest Jeep-Eagle, Inc.,* 162 F.R.D. 302, 308 (N.D. Ill. 1995)) (further internal quotation omitted).

Rex and PennTex do not challenge the competency of the plaintiffs' proposed class counsel. Instead, they argue that the plaintiffs have interests that are antagonistic to other proposed class members and cannot therefore advocate vigorously for them. First, the defendants claim the plaintiffs' disavowal of personal injury claims creates a conflict with proposed class members who have allegedly suffered personal injury from the defendants' acts and whose claims will be barred by *res judicata* if not litigated in this action. They cite cases in support of the proposition that "[t]he failure to seek full recovery by splitting out personal injury and property damage claims creates a significant conflict of interest destroying adequacy of representation." *Wilson v. Home Depot U.S.A., Inc.*, 225 F.R.D. 198, 203 (W.D. Tex. 2004) (citing *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 209 F.R.D. 323, 340 (S.D.N.Y. 2002)); *Western States Wholesale, Inc. v. Synthetic Indus., Inc.*, 206 F.R.D. 271, 277 (C.D. Cal. 2002)).

The contention that *res judicata* would bar future personal injury claims is without merit. A class action judgment binds class members to the judgment in the case, but the preclusive effect of a judgment in a class action seeking only declaratory or injunctive relief does not extend to class members' individual damage claims brought in separate actions. *See Cooper v.*

*Federal Reserve Bank of Richmond,* 467 U.S. 867, 880 (1984) ("pattern and practice" class action discrimination judgment did not bar separate suits under disparate treatment theory); *Bentley v. Honeywell Int'l, Inc.*, 223 F.R.D. 471, 483 (S.D. Ohio 2004) (class action for injunctive relief and property damages was not *res judicata* for subsequent personal injury suits); 18 Wright, Miller & Cooper, *Federal Practice and Procedure* § 4455 (1981) ("So an individual who has suffered particular injury as a result of practices enjoined in a class action should remain free to seek a damages remedy even though claim preclusion would defeat a second action had the first action been an individual suit for the same injunctive relief."); *see, e.g., Crowder v. Lash*, 687 F.2d 996, 1008-09 (7th Cir. 1982) (finding it unacceptable to require inmate to elect between joining class suit for injunctive relief, forfeiting claim for individual damages, and opting out of suit for injunctive relief to preserve damage claim). In this case, the relevant injunctive relief requested is the formation of a court-supervised medical monitoring fund. A judgment on that claim would not prevent a class member from later bringing a personal injury lawsuit seeking damages, although the class member may be bound by issues actually determined in the class action and may be unable to recover for services received from the medical monitoring fund.

Second, the defendants argue the plaintiffs, both of whom claim to be suffering physical injuries from exposure to $H_2S$ from the defendants' facilities, would not vigorously pursue a medical monitoring fund, a remedy designed for those who are not yet injured, because they are no longer in need of medical monitoring. It is true that a plaintiff may be an inadequate class representative if her interest in immediate medical treatment competes with other class members' interest in medical monitoring for future problems. *See Amchem*, 521 U.S. at 626 ("[F]or the

currently injured, the critical goal is generous immediate payments.  That goal tugs against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future.").

This is not such a case.  This case is not like *Amchem* because it does not seek damages for medical problems that have already manifested themselves.  Thus, there is no financial "tug" of such claims against medical monitoring claims.  Furthermore, here the named plaintiffs have an incentive to seek a medical monitoring fund even though they have already been diagnosed with some problems they believe are related to the defendants' conduct.  Because $H_2S$ can cause so many varied types of problems – according to the plaintiffs, neurological, cardiac, respiratory and "other related health problems," Compl. ¶ 2 – even if one problem develops, the plaintiff would still have an incentive to seek medical monitoring for others that have not developed.  The plaintiffs have an undivided interest in seeking an adequate medical monitoring fund.

Having found the plaintiffs can satisfy the requirements of Rule 23(a), the Court now turns to the requirements of Rule 23(b).

D.     Rule 23(b) Requirements

The plaintiffs seek class certification under all three sections of Rule 23(b).  The Court will address each the requirements of each provision in turn, beginning with Rule 23(b)(3).

1.     Rule 23(b)(3)

Rule 23(b)(3) requires that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action be superior to other ways of adjudicating the controversy.  Fed. R. Civ. P. 23(b)(3);  *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615 (1997);  *Mejdrech v. Met-Coil Systems Corp.*, No.

01 C 6107, 2002 WL 1838141 (N.D. Ill. Aug. 12, 2002), *aff'd*, 319 F.3d 910 (7th Cir. 2003). This category was designed "to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Amchem*, 521 U.S. at 615 (quoting Fed. R. Civ. P. 23 advisory committee's note to 1996 amendment).

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* at 623. Rule 23(b)(3) predominance requirement overlaps considerably with Rule 23(a)(2)'s commonality requirement, although the predominance requirement is "far more demanding." *Id.* at 624. Rule 23(a)(2) requires common issues of law or fact, and Rule 23(b)(3) requires that such common issues not only exist but predominate over others in the case. *Mejdrech*, 2002 WL 1838141 at * 6 (citing *Demitropoulos v. Bank One Milwaukee, N.A.,* 915 F. Supp. 1399, 1419 (N.D. Ill. 1996)). However, when a Court chooses to limit class certification only to certain common issues under Rule 24(c)(4), those issues necessarily predominate and satisfy the first element of Rule 23(b)(3). H. Newberg, 2 *Newberg on Class Actions*, § 4.23 (3d ed. 1992); *see, e.g., Mejdrech*, 319 F.3d at 911. Thus, differences in proposed class members' damages need not prevent certification under Rule 23(b)(3) of common issues, leaving individual damage determinations for later proceedings. *See Mejdrech*, 2002 WL 1838141 at * 7 (citing *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 233 (7th Cir. 1983)); *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988); *Schneider v. United States*, 197 F.R.D. 397, 402 (D. Neb. 2000).

Again, Rex and PennTex point to the need for complex, individualized determinations of causation and damages to argue that common issues do not predominate over individual ones.

However, this Court agrees with the *Mejdrech* District Court that certification should be limited under Rule 4(c) to the questions of whether the defendants polluted excessively and, if so, whether the pollution reached the class members' property. The class being so limited, these issues predominate over individualized questions regarding causation and damages, which can be decided in later individualized proceedings.

The second part of Rule 23(b)(3) requires a determination whether class action is superior to other means of adjudicating this dispute. The Court considers, among other factors,

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

The defendants argue that class action is not the best way of resolving the current disputes because of the numerous issues that would have to be determined individually for every potential class member. They also argue that the consent decree between the defendants, the EPA and the IEPA is a better measure of the appropriate remedial measures in this case and that this litigation is not a fair or efficient way of achieving the little additional redress for class members that might be available.

Again, the Court agrees with the *Mejdrech* District Court that class action is superior to decide whether and to what extent the defendants unlawfully polluted the Class Area. These questions would be answered using the same proof for each proposed class member, and it would be a waste of time and resources to conduct thousands of trials to determine these same issues in individual cases. *See Mejdrech*, 2002 WL 1838141 at * 7. Each individual's property damage or injunctive relief claims are not likely to warrant the time and expense of hiring the

necessary expert witnesses for an individual case and pursuing it to judgment.  Furthermore, without class treatment, there would likely be inconsistent results for similarly situated individuals on the common questions of fact or law.  Class action is far better suited to fairly and economically achieve uniform results with respect to those common questions.  It is likely that individual class members would willingly cede control over their individual property damage and injunctive relief claims to achieve the economies of class action.  Furthermore, there is no indication there are any individual property damage or injunction lawsuits by proposed class members that would be affected by certification of this case as a class action.  Finally, should individualized property damage hearings be required, the Court believes it would be able to manage them at least until a reasonable settlement position developed or until other judicial resources within the district could be enlisted to assist in the hearings.

This is not the case for the plaintiffs' claim for medical monitoring.  Again the Court notes that the relevant question at the class certification stage is not whether $H_2S$ causes or increases the risk for certain personal injuries or whether testing can prevent or diagnose those injuries.  It is whether a class action is a proper and superior vehicle for litigating medical monitoring claims.  The Court believes it is not.  Medical monitoring claims typically seek a monitoring program comprised of a regimen of medical tests and services to each class member. *See, e.g., In re Fosamax Prods. Liab. Litig.*, 248 F.R.D. 389, 395 (S.D.N.Y. 2008).  "The purpose of medical monitoring compensation is to enable the plaintiff to obtain information about his or her future diseases as early as possible.  That information, in turn, enables the plaintiff to seek early treatment, so that the injuries will be minimized."  25 Am. Jur. 3d *Proof of Facts* 313 § 8.  Medical monitoring does not include treatment if a disease is diagnosed.  *Id*. at §

11.

While the Illinois Supreme Court has not decided whether such a cause of action exists in

Illinois absent an actual physical injury, federal courts in Illinois have predicted that it would.

*See Carey v. Kerr-McGee Chem. Corp.*, 999 F. Supp. 1109, 1119-20 (N.D. Ill. 1998); *see also*

*Stella v. LVMH Perfumes & Cosmetics USA, Inc.*, 564 F. Supp. 2d 833, 836 (N.D. Ill. 2008);

*Muniz v. Rexnord Corp.*, No. 04 C 2405, 2006 WL 1519571, *7 (N.D. Ill. May 25, 2006);

*Guillory v. American Tobacco Co.*, No. 97 C 8641, 2001 WL 290603, *7 (N.D. Ill. 2001).

Medical monitoring claims in other states generally allow a plaintiff to "recover the cost of

diagnostic medical evaluation proved to be proximately caused by the defendant's wrongdoing."

*Guillory*, 2001 WL 290603 at *7 n. 2.  Those states require a plaintiff to prove:

> (1) exposure greater than normal background levels; (2) to a proven hazardous
> substance; (3) caused by the defendant's negligence; (4) as a proximate result of
> the exposure, plaintiff has a significantly increased risk of contracting a serious
> latent disease; (5) a monitoring procedure exists that makes the early detection of
> the disease possible; (6) the prescribed monitoring regime is different from that
> normally recommended in the absence of the exposure; and (7) the prescribed
> monitoring regime is reasonably necessary according to contemporary scientific
> principles.

*Id.* at *7 n. 3 (citing *Redland Soccer Club v. Dep't of Army*, 696 A.2d 137, 145-46 (Pa. 1997)).

The level of individualized inquiry is far greater in a medical monitoring cause of action

that it is in a property damage cause of action or claim for injunctive relief.  With respect to the

property damage or injunction claims of the proposed class the issues will be fairly

straightforward:  did the defendants cause pollution that reached the particular class member's

land and, if so, what is the resulting diminution in value of that land?  Evidence to establish the

answers to those questions will likely involve expert testimony about pollution dispersion and

real estate valuation.  Although with respect to the latter evidence individualized assessments

will be necessary, real estate valuation is not so complex as to make such assessments prohibitively difficult or time-consuming.

On the other hand, with respect to a medical monitoring claim the inquiry would be infinitely more complex and individualized, and no question of fact or law would predominate over individualized questions. The Court would face complex medical questions regarding the allegedly wide-ranging effects of excessive $H_2S$ on the human body and the appropriate diagnostic tests, if any exist, to detect the problems attributable to $H_2S$ in individuals of varying health backgrounds and varying alternate exposures to $H_2S$ not caused by the defendants. Such medical inquiries are more complex than the relatively straightforward real estate valuation inquiry required for property damage claims. Furthermore, proposed class members are likely to want to consult with their own physicians about the risks and benefits of diagnostic tests to be performed on them in light of their own health backgrounds instead of leaving it to the class representatives and the Court to make those medical decisions for them.

In a medical monitoring class action, the Court would also have to determine the level of each individual class member's exposure to the defendants' $H_2S$, that is, whether a particular class member was present at the precise times the defendants' $H_2S$ was present or excessive, and whether that exposure put them at higher risk of health problems in order to establish his or her entitlement to medical monitoring funded by the defendants. After all, absentee or corporate landowners would have no need of medical monitoring.[3] This determination could require

_____

[3]Because the parties have not addressed the issue in their briefing, the Court has not discussed the potential conflict of interest between resident, individual class members, who have an interest in seeking funds for medical monitoring *and* property damage claims, and absentee or corporate landowners, whose sole interest is in maximizing property damage claims.

review of each class member's daily activities in comparison with documented pollution levels as well as an individualized assessments of baseline health risks absent $H_2S$ exposure before the Court could determine whether the class member was entitled to medical monitoring. Such detailed inquiries are likely to be unmanageable and inefficient if given class treatment and, accordingly, should be reserved for individual treatment in separate lawsuits by those who believe they can prevail. This result is not inconsistent with *Medjrech*, which did not involve a medical monitoring claim.

For these reasons, the Court finds the predominance and superiority requirements of Rule 23(b)(3) are met only with respect to the property damage and injunctive relief claims but not the medical monitoring claim.

### 2. Rule 23(b)(2)

The Court may certify a claim under Rule 23(b)(2) if the requirements of Rule 23(a) are satisfied and:

> the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

Fed. R. Civ. P. 23(b)(2). The Court must find that the opposing parties' conduct or refusal to act was generally applicable to the class and that final injunctive or declaratory relief with respect to the entire class would be the appropriate remedy. *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596 (7th Cir. 1993). "As a general matter, Rule 23(b)(2) is invoked in cases where injunctive or declaratory relief is the primary or exclusive relief sought." *Buycks-Roberson v. Citibank Fed. Sav. Bank*, 162 F.R.D. 322, 335 (N.D. Ill. 1995). Therefore, "the primary limitation on the use of Rule 23(b)(2) is the requirement that injunctive or

declaratory relief be the predominant remedy requested for the class members." *Doe v. Guardian Life Ins. Co.*, 145 F.R.D. 466, 477 (N.D. Ill. 1992). This subsection does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages. *Moore's Federal Practice* ¶ 23 App. 04[02]. The dispositive factor that must be assessed in determining whether a class may be certified under Rule 23(b)(2) is the type of relief the plaintiffs actually seek. *Dhamer v. Bristol-Myers Squibb, Co.*, 183 F.R.D. 520, 528 (N.D. Ill. 1998).

The defendants argue that the doctrine of primary jurisdiction should preclude class certification under Rule 23(b)(2) of the plaintiffs' claims for injunctive relief since the USEPA and the IEPA have entered into a consent decree with Rex and PennTex to identify and control $H_2S$ emissions in the Lawrence Wellfield, which encompasses the Class Area. "The doctrine of primary jurisdiction allows a federal court to refer a matter extending beyond the 'conventional experiences of judges' or 'falling within the realm of administrative discretion' to an administrative agency with more specialized experience, expertise, and insight." *In re StarNet, Inc.*, 355 F.3d 634, 639 (7th Cir. 2004) (quoting *National Commc'ns Ass'n v. AT & T Co.*, 46 F.3d 220, 222-23 (2d Cir. 1995)). When a court chooses to exercise primary jurisdiction, it does not dismiss the litigation but stays it pending the results of the agency's resolution of the issue, and the action resumes after the agency's decision if that decision has not resolved the entire controversy. *Baker v. IBP, Inc.*, 357 F.3d 685, 688 (7th Cir. 2004); *Marseilles Hydro Power, LLC v. Marseilles Land & Water Co.*, 299 F.3d 643, 651 (7th Cir. 2002).

The Court of Appeals for the Seventh Circuit has used the doctrine of primary jurisdiction to refer to the Federal Communications Commission ("FCC") the interpretation of

the word "location" in the telephone number portability provision of the Telecommunications Act of 1996, 47 U.S.C. § 153(30), for which the FCC was charged with prescribing requirements. *See id.* at 639. The Court of Appeals has also declined to invoke the doctrine to facilitate an end run around RCRA where a citizen suit, such as the case at bar, satisfies the requirements set forth in 42 U.S.C.A. § 6972. *See PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 619 (7th Cir. 1998). The Court there reasoned that since "Congress ha[d] *specified* the conditions under which the pendency of other proceedings bars suit under RCRA and . . . those conditions ha[d] not been satisfied," it was inappropriate to apply the doctrine of primary jurisdiction. *Id.* (italics in original). Here, there is no indication the plaintiffs have not satisfied RCRA's requirements for filing a citizen suit. Therefore, for the reasons set forth in *PMC*, the Court will not use the doctrine of primary jurisdiction to accomplish an end run around those requirements.

The Court now turns to the requirements specifically listed in Rule 23(b)(2). The "general applicability" requirement of Rule 23(b)(2) is satisfied. The "general applicability" requirement means that "the party opposing the class must have acted in a consistent manner toward members of the class so that [its] actions may be viewed as part of a pattern of activity." *Edmondson v. Simon*, 86 F.R.D. 375, 382-83 (N.D. Ill. 1980). However, "[a]ll the class members need not be aggrieved by or desire to challenge the defendant's conduct." *Id.* In the instant case, the general applicability requirement is satisfied by the plaintiffs' allegations that the defendants engaged in a single pattern of activity that resulted in excessive amounts of $H_2S$ contaminating the Class Area. Indeed, it is the defendants' common conduct of operating its oil wells and storage facilities that is alleged to have impacted all members of the proposed class.

Furthermore, equitable relief would be appropriate. The plaintiffs' requested relief regarding the existence of and extent of $H_2S$ contamination is primarily equitable. To determine whether the named plaintiffs seek primarily equitable relief or money damages, the plaintiffs' specific request for relief must be closely scrutinized and consideration must be given to whether the "crux of the action is for money damages." *Dhamer*, 183 F.R.D. at 529 (quoting *Cook v. Rockwell Int'l Corp.*, 181 F.R.D. 473, 479-80 (D. Colo. 1998)). "Rule 23(b)(2) does not preclude monetary recovery when it is either part of the equitable relief granted or is secondary or ancillary to the predominant injunctive or declaratory relief sought." *Orlowski v. Dominick's Finer Foods, Inc.*, 172 F.R.D. 370, 374 (N.D. Ill. 1997) (internal quotations omitted). While this case does indeed seek money in the form of damages to property, is it secondary or ancillary. The primary relief requested is the creation of a medical monitoring fund, a determination of the existence and extent of the contamination, and an injunction requiring the cessation of further contamination and abatement of existing contamination.

Nevertheless, certification of the medical monitoring claim is not appropriate under Rule 23(b)(2). Although Rule 23(b)(2) does not expressly contain a predominance and superiority requirement as does Rule 23(b)(3), certification under Rule 23(b)(2) "does not relieve a court of its obligation to determine whether the existence of individual issues precludes certification." *Dhamer*, 183 F.R.D. at 529 (quoting *Barnes v. American Tobacco Co.*, 176 F.R.D. 479, 500 (E.D. Pa. 1997)). For the same reasons the Court found the medical monitoring claim was not appropriate for class treatment under Rule 23(b)(3), it also finds that claim is unmanageable under Rule 23(b)(2) and will not be so certified.

3.        Rule 23(b)(1)

Rule 23(b)(1) is satisfied where prosecuting separate actions create a risk of inconsistent or varying adjudications that would establish inconsistent standards of conduct for the defendants.

Trying individual actions brought by multiple plaintiffs could likely result in varying adjudications regarding the existence of and extent of unlawful pollution by the defendants. As a result of multiple cases, the defendants could become bound by different or conflicting obligations regarding their continued operations of their oil wells and storage facilities or their efforts to clean existing pollution, should it be found. Class treatment would be appropriate to establish one single standard of conduct for the defendants' operations in and around the Class Area.

This is not true, however, for medical monitoring claims. As noted earlier, individualized issues predominate with respect to such a claim. A decision as to a particular proposed class member in a medical monitoring claim is unlikely to be inconsistent with such a decision in another proposed class member's claim because, as noted earlier, the class members are likely to have varying backgrounds and conditions rendering their situations distinguishable. There may be perfectly good reasons to reach different results for different proposed class members in medical monitoring claims, and the inconsistency of those results is not a concern.

In sum, the plaintiffs have satisfied the requirements of Rule 23(b)(1), (2) and (3) for class certification on the question of whether and to what extent the defendants contaminated the Class Area with $H_2S$ but not as to the question of whether a medical monitoring fund is appropriate or to the question of individual property damage amounts.

**III. Conclusion**

With the aforementioned exception regarding the temporal and geographic definition of the class, the plaintiffs have satisfied the requirements of Rule 23(a) and Rule 23(b)(1), (b)(2) and (b)(3) for class certification as to questions of the existence and extent of the defendants' unlawful contamination and as to the award of injunctive relief regarding cessation of further contamination and abatement of existing contamination. They have not satisfied the requirements of Rule 23(a) and (b) for a medical monitoring claim. The Court **ORDERS** the plaintiff to submit a revised class definition, agreed by all parties if possible, consistent with this order on or before January 16, 2009. The Court **RESERVES RULING** on the motion for class certification (Doc. 62) until that time.

**IT IS SO ORDERED.**
**DATED:  December 19, 2008**

<div style="margin-left:40%">

s/ J. Phil Gilbert_____
**J. PHIL GILBERT**
**DISTRICT JUDGE**

</div>